[No. B049694. Second Dist., Div. Four. Sept. 13, 1990.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
ALONDRO DURELL BENNETT, Real Party in Interest.

COUNSEL

Ira Reiner, District Attorney, Donald J. Kaplan and George M. Palmer, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Wilbur F. Littlefield, Public Defender, Laurence M. Sarnoff, Ary De Groot, and Henry J. Hall, Deputy Public Defenders, for Real Party in Interest.

## OPINION

**GEORGE, J.**—Pursuant to Penal Code section 995, the superior court granted the motion of defendant, Alondro Durell Bennett, to set aside that portion of an information charging him with the murder of his two accomplices who were killed by the owner of a market during the commission of an armed robbery of the establishment. The People petitioned this court for a writ of mandate, urging that the superior court erred because the deaths of defendant's accomplices were attributable to (1) an intentional act of defendant, and (2) intentional acts of defendant's accomplices for which defendant is vicariously liable. ■ ■■■ For the reasons that follow, we issue a writ of mandate directing respondent superior court to vacate its order and enter an order denying defendant's motion to set aside the information.[1]

## PROCEDURAL AND FACTUAL HISTORY

Defendant was charged by information with the murder of Jerald Anthony Bennett (Pen. Code, § 187, subd. (a)),[2] the murder of Jerald Jarred Bennett, the murder of Jose Castillo, Jr., the attempted murder of Jose Castillo, Sr. (§§ 664, 187, subd. (a)), and the second degree robbery of Candy Castillo (§ 211). The information further alleged, as special circumstances, that defendant committed multiple murders and that the murder of Jose Castillo, Jr., was committed during the commission of a robbery. (§ 190.2, subds. (a)(3), (a)(17).)

The following evidence was received at the preliminary hearing. The residence of the Castillo family[3] was located in the same building in Compton that housed the "mini-market" they operated as a family business. Approximately 4 p.m. on March 14, 1989, 19-year-old Carlos Castillo was

---

[1] We disagree with defendant's contention that the petition, filed 38 days after the superior court's ruling, was not timely under Penal Code section 999a. That statute requires that, under certain circumstances, a petition for a writ of prohibition must be filed within 15 days after denial of a Penal Code section 995 motion. This 15-day limit, by the express terms of the statute, applies only to petitions filed by defendants (as defendant in the present case concedes) and only to petitions predicated on certain enumerated grounds. (*Ondarza* v. *Superior Court* (1980) 106 Cal.App.3d 195, 200 [164 Cal.Rptr. 892].) We decline defendant's invitation to expand the scope of section 999a beyond its terms. (*People* v. *Superior Court* (*Calamaras*) (1986) 181 Cal.App.3d 901, 904-905 [226 Cal.Rptr. 636].)

Similarly without merit are defendant's related contentions based on the decision in *People* v. *Municipal Court* (*Mercer*) (1979) 99 Cal.App.3d 749 [160 Cal.Rptr. 455] and the doctrine of laches. (*People* v. *Superior Court* (*Clements*) (1988) 200 Cal.App.3d 491, 495-496 [246 Cal.Rptr. 122].)

[2] All further statutory references are to the Penal Code.

[3] For clarity and ease of reference, we shall refer to Jose Castillo, Sr., as Mr. Castillo and, on occasion, refer to his children by their first names.

working near the cash register with his 16-year-old sister, Candy, when defendant entered the store accompanied by two other men. One of defendant's companions approached the cash register while defendant and the third man went to separate areas of the store. The man near the cash register conversed briefly with Carlos, and then defendant and his two companions simultaneously removed guns from their jackets and pointed them at Carlos and Candy. The gunman near the cash register ordered Candy to "open it" and then pushed her out of the way and removed money from the register.

Seventeen-year-old Cynthia Castillo was in the doorway which connected the market to the kitchen of the residence, carrying her one-year-old brother, when she saw a man (one of defendant's accomplices) pointing a gun at her sister Candy. Cynthia turned and ran into the residence with the gunman in pursuit. She attempted to close the door behind her, triggered an alarm, and yelled to her father that three persons were robbing the market. As she ran into a bedroom, she saw her 14-year-old brother, Jose Castillo, Jr., standing in the hallway, speaking to Mr. Castillo. Cynthia heard a gunshot, and Jose began screaming.

When Mr. Castillo had heard Cynthia exclaim that a robbery was occurring, he went to the window and then heard a gunshot come from the kitchen. After realizing that Jose had been shot, Mr. Castillo briefly observed a man leaving the kitchen and entering the store.

When the gunman reentered the store, Carlos grabbed him around the neck. The gunman bit Carlos on the finger and pointed his gun at Carlos's face, while one of his accomplices (not defendant) approached and pointed his gun at Carlos. Afraid, Carlos let himself fall to the ground.

While Carlos was struggling with these two gunmen, Mr. Castillo retrieved a gun he kept hidden in the living room. Because the telephone in his apartment was disconnected, Mr. Castillo started to go outside to use a telephone in front of the store to summon medical care for Jose but stopped when he saw defendant standing in the entrance to the store holding a gun. Mr. Castillo instead entered the store through the kitchen, hoping defendant had left. Observing that defendant still was in the doorway, Mr. Castillo began walking toward defendant in an effort to reach the telephone outside. When Mr. Castillo had taken one or two steps, defendant began shooting at him. Mr. Castillo fired back at defendant. Defendant fired a number of shots in return and then ran from the store.

Believing defendant had fled, and hearing the "terrorized shouts" of his children, Mr. Castillo ran to the cash register. One of the other gunmen was

holding Carlos by the neck and attempting to "drag him," while another gunman (not defendant) held a gun to Carlos's neck. At close range, Mr. Castillo fired two shots into the man holding Carlos, causing that individual to fall to the ground, face down.

Mr. Castillo attempted to shoot the remaining gunman but found his gun was empty. Using ammunition he kept near the cash register, Mr. Castillo tried to reload his weapon but, because he was nervous, succeeded in loading only one bullet. When he looked up, Mr. Castillo saw the gunman enter the kitchen where Mr. Castillo knew his younger children were located. To protect his children, Mr. Castillo entered the kitchen but, as he did so, saw that his six-year-old son, Malcolm, was within a few feet of the gunman. As Mr. Castillo hesitated, the gunman reached toward the boy as if to summon him and then pointed his gun at the boy's head. Mr. Castillo leapt toward the gunman, at the same time firing his gun at the gunman's head. The gunman fell, and Mr. Castillo fell on top of him, striking the gunman until Mr. Castillo realized he was not moving.

When the shooting had stopped, Candy saw her brother, Malcolm, near the cash register. Candy jumped over the counter, picked him up, ran out the store entrance, and left Malcolm at a neighbor's house. As she returned to the store, she saw a man fitting defendant's description run from near the store entrance through the parking lot.

Defendant's accomplices, Jerald Jarred Bennett and Jerald Anthony Bennett, died respectively of a gunshot wound to the neck and multiple gunshot wounds. Jose Castillo, Jr., died one month after the incident as a result of a gunshot wound to the chest.

At the hearing conducted pursuant to section 995, the superior court concluded that defendant's act of shooting at Mr. Castillo constituted conduct provocative of a lethal response beyond that required to commit the underlying felony of robbery but that such conduct was not a proximate cause of the death of defendant's accomplices. The superior court noted that defendant's accomplices died after the gun battle between defendant and Mr. Castillo had ended and defendant had left the market, and concluded that Mr. Castillo shot the other gunmen in response to their subsequent threatening actions toward Mr. Castillo's children. The superior court set aside the first two counts of the information charging defendant with the murder of his accomplices and set aside the multiple-murder special circumstances allegation.

### DISCUSSION

■ "Under Penal Code section 995, an information must be set aside if the defendant has been committed without 'reasonable or probable cause.' "

(*Taylor* v. *Superior Court* (1970) 3 Cal.3d 578, 581-582 [91 Cal.Rptr. 275, 477 P.2d 131], overruled on another ground in *People* v. *Antick* (1975) 15 Cal.3d 79, 92, fn. 12 [123 Cal.Rptr. 475, 539 P.2d 43].) "Evidence that will justify a prosecution need not be sufficient to support a conviction. [Citations.] . . . An information will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it. [Citations.]

"A reviewing court may not substitute its judgment as to the weight of the evidence for that of the magistrate, and, if there is some evidence to support the information, the court will not inquire into its sufficiency. [Citations.] Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information. [Citations.]" (*Rideout* v. *Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197].)

■■ ■■ ■■ Where an accomplice is killed by a victim or a law enforcement officer during the commission of a robbery, a defendant may be convicted of murder based either on direct liability arising from the defendant's own acts or vicarious liability arising from the acts of the defendant's accomplices.[4] " 'When the defendant or his accomplice, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and his victim or a police officer kills in reasonable response to such act, the defendant is guilty of murder. . . . ' [Citation.]" (*Taylor* v. *Superior Court, supra,* 3 Cal.3d 578, 582-583.)

Because frequently in a robbery situation there is a possibility the victim will resist and kill, "the central inquiry in determining criminal liability for a killing committed by a resisting victim or police officer is whether the *conduct* of a defendant or his accomplices was sufficiently provocative of lethal resistance to support a finding of implied malice." (*Taylor* v. *Superior Court, supra,* 3 Cal.3d 578, 583, italics in original.) "[T]he life-threatening act on which that liability is premised must be something beyond the underlying felony itself and must be a proximate cause of death." (*In re Joe R.* (1980) 27 Cal.3d 496, 505 [165 Cal.Rptr. 837, 612 P.2d 927].)

■■ In the present case, the superior court held that defendant's act of shooting at Mr. Castillo constituted provocative conduct beyond that required to commit the underlying felony of robbery but concluded (unlike the magistrate) that such conduct was not a proximate cause of the death of defendant's accomplices. The court ruled that Mr. Castillo shot defendant's

---

[4] The felony-murder doctrine, of course, does not apply where the killing is committed by the victim rather than the defendant or an accomplice. (*Taylor* v. *Superior Court, supra,* 3 Cal.3d 578, 582.)

accomplices solely in response to their subsequent actions threatening Mr. Castillo's children.

We agree with the superior court's ruling that defendant's initiation of a gun battle with Mr. Castillo was conduct provocative of a lethal response beyond that inherent in the underlying felony of robbery. (*In re Joe R.*, *supra*, 27 Cal.3d 496, 507.) We disagree, however, with the superior court's conclusion that such conduct was not a proximate cause of the death of defendant's accomplices.

■ "To be considered a *proximate* cause of [an accomplice's] death, the acts of the defendant[] must have been a 'substantial factor' contributing to the result. [Citations.]" (*People* v. *Caldwell* (1984) 36 Cal.3d 210, 220 [203 Cal.Rptr. 433, 681 P.2d 274], italics in original.) "Decisions in cases involving conduct of more than one co-felon acting in concert reflect the settled view that the extent of an individual's contribution to the resulting death need not be minutely determined." (*Id.*, at p. 221.)

In *People* v. *Caldwell*, *supra*, 36 Cal.3d 210, the two surviving perpetrators of an armed robbery were convicted of the murder of their accomplice, who was killed by law enforcement officers. Prior to the shooting, the three robbers, with defendant Caldwell driving, led sheriff's deputies on a high-speed chase, during which the suspects' vehicle violated traffic signals and stop signs and collided with another vehicle. As the chase ended, defendant Washington aimed a shotgun at the sheriff's deputies in an approaching patrol vehicle, but the weapon flew from Washington's hands when the patrol vehicle rammed the suspects' automobile.

Thereafter, the deputies in *Caldwell* took cover with their weapons drawn. The defendants' accomplice, Belvin, aimed a revolver out the window, while Caldwell crouched behind a door of the vehicle holding a handgun. The opinion states: "Belvin moved his gun back and forth in a sweeping motion, ignoring repeated orders to 'freeze' and 'drop the gun.' When Belvin took aim at two of the deputies and failed to respond to a last order to drop his weapon," the deputies opened fire, killing Belvin. (*People* v. *Caldwell*, *supra*, 36 Cal.3d 210, 215.)

The defendants Caldwell and Washington contended they were not responsible for Belvin's death because "it was Belvin's act of pointing a gun out the window of the car that precipitated the deputies' fire." (*People* v. *Caldwell*, *supra*, 36 Cal.3d 210, 217.) Although Caldwell's dangerous, high-speed driving and Washington's aiming of the shotgun at the sheriff's deputies both constituted acts provocative of a lethal response, the defendants argued that following these acts, the sheriff's deputies gave the robbers an

opportunity to surrender and began firing only when Belvin ignored commands to drop his weapon and aimed at the sheriff's deputies.

The Supreme Court rejected the foregoing contention, noting that "[t]he jury might have concluded on the evidence that there was *more than one proximate cause* of the killing . . . ." (*People* v. *Caldwell, supra,* 36 Cal.3d 210, 219, italics added.) The court stated: "Though the deputies did not begin firing immediately, but gave the suspects an opportunity to drop their guns, it can hardly be said that whatever provocative force the high-speed chase and Washington's apparent attempt to shoot two policemen may have had dissipated . . . . The lull in the action was precarious and short-lived . . . . Thus, a reasonable trier of fact could have concluded that the officers' lethal response was provoked by a violent confrontation which was the product of the actions of both Caldwell and Washington, as well as those of Belvin. [Fn. omitted.]" (*Id.,* at pp. 219-220.)

We reach a similar conclusion in the present case. Although defendant's gun battle with Mr. Castillo ended when defendant fled from the market, "[t]he lull in the action was precarious and short-lived." (*People* v. *Caldwell, supra,* 36 Cal.3d 210, 220.) The violent confrontation defendant initiated by shooting at Mr. Castillo continued without substantial interruption after defendant's departure from the scene, as Mr. Castillo turned his attention to defendant's armed accomplices. The circumstance that defendant's accomplices also contributed to their own deaths by threatening Mr. Castillo's children signifies only that there was more than one proximate cause of the accomplices' deaths and does not alter our conclusion (and that of the magistrate) that defendant's actions were a substantial factor in causing those deaths. Because "[a]n information will not be set aside . . . if there is some rational ground for assuming the possibility that an offense has been committed" (*Rideout* v. *Superior Court, supra,* 67 Cal.2d 471, 474), we conclude that the superior court erred in setting aside a portion of the information.

In light of our holding, and in light of the superior court's having made only passing reference to the issue of vicarious liability, we need not, and therefore do not, address the People's contention that defendant may be convicted of the murder of his confederates based upon the additional theory that he is vicariously liable for the acts of his accomplices. (See *People* v. *Antick, supra,* 15 Cal.3d 79, 90-91.)

### DISPOSITION

Let a peremptory writ of mandate issue directing respondent superior court to vacate its March 19, 1990, order in case No. A 652720 granting, in

part, defendant's motion to set aside the information, and directing that court to enter an order denying that motion.

Woods (A. M.), P. J., and Epstein, J., concurred.